UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON, ss

|   |   |
|---|---|
| TERECK JAMISON, ) |   |
|     Plaintiff ) |   |
| ) |   |
| v. ) |   |
| ) | CIVIL ACTION NO. |
| CITY OF BOSTON – SOAR BOSTON ) |   |
| LEEROY PEEPLES, ) |   |
| TALIA WRIGHT-RIVERA, and ) |   |
| WASCAR CASTILLO ) |   |
|     Defendants ) |   |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Parties, Jurisdiction and Venue

1. Plaintiff, Tereck Jamison ("Plaintiff") is an individual residing at 300 Roxbury Street, Apt. 5, Boston MA 02119. He is 45 years old, born on 3/28/1977 and is Black.

2. Defendant City of Boston – SOAR Boston ("SOAR"), which stands for Street Outreach Advocacy and Response. SOAR is the City's gang intervention program, located at 1483 Tremont Street, Dorchester, MA 02118.

3. Defendant Leeroy Peeples (hereinafter "Mr. Peeples") is an individual residing at 5 Linden Park Drive, Randolph, MA 02368, and upon information and belief at all relevant times was the Strategy and Operations Manager at SOAR with managerial authority over all SOAR employees.

4. Defendant Talia Wright-Rivera (hereinafter "Ms. Wright-Rivera") is an individual residing at 24 Rosewood Street, Mattapan, MA, 02126, and upon information and belief

at all relevant times was the Director of SOAR with managerial authority over all of its employees.

5. Defendant Wascar Castillo (hereinafter "Ms. Castillo") (collectively "Defendants") is an individual with a business address of 1483 Tremont Street, Dorchester MA 02118 and upon information and belief at all relevant times was the Director of Human Resources of SOAR.

6. The Court has jurisdiction over this case pursuant to 28 U.S.C. sec. 1331, and venue is appropriate because most or all of the parties reside in or have a business address in Suffolk County.

**Facts**

7. Plaintiff reasserts the facts set forth in paragraphs 1-6.

8. SOAR is a gang intervention program funded and managed by the City of Boston.

9. At all relevant times, the SOAR program employed approximately 33 individuals, of whom approximately 31 are people of color; however, Black employees were largely Streetworkers and Streetworker Supervisors, while Hispanics were largely in management rolls.

10. In 2014, Plaintiff was hired by the City of Boston as a Violence Interrupter in gang intervention and prevention, and was promoted to the position of Streetworker in 2017.

11. Some time in 2018, Plaintiff took a leadership role in the SEIU Local 888, which was the Union to which most SOAR employees belonged. He was involved in collective bargaining negotiations with the Defendant City, among other duties.

12. In approximately July 2019 the program was renamed as SOAR Boston and he was then titled a Streetworker for the City doing the same job as he had previously.

13. Prior to Defendant Wright-Rivera becoming the Director of the Program, the atmosphere in the program was collegial and like a family.

14. Defendant Wright-Rivera had been a Streetworker in 2006 for the City's gang intervention program; she left at some point thereafter and was rehired as the Director of the SOAR program in July 2019.

15. When Defendant Wright-Rivera became the Director, she began to bully and harass older workers, disabled workers and workers who were Union stewards, including Plaintiff.

16. Defendant Wright-Rivera would say at roll call in the afternoon, in front of the entire SOAR staff, that anyone over 40 was too old for SOAR and should find a new job.

17. From July 2019 to June 2020, Defendant Wright-Rivera would often target certain older individuals for discipline and ultimately termination, including workers Robert Miller, Jackie Perry and Robyn Christian, all over the age of 50. All of these workers were also Black.

18. From about July 2019 to March 2020, Defendants Wright-Rivera and Leeroy Peeples would harass and make fun of Senior Streetworker, Robert Miller, a Black employee, because he had several disabilities resulting from his ongoing stage-4 cancer treatment, including incontinence. For instance, Defendants Peeples and Wright-Rivera would not allow Miller to ride the van, even while other, non-disabled workers could. He had to walk. They refused to accommodate his disability and made fun of his incontinence, both publicly and privately.

19. Throughout 2019, coworker Jackie Perry, also Black, and in her 60's, was harassed for her age and disability. She had had recent back surgery, and was moving more slowly. Defendant Peeples called Ms. Perry "dead weight" and "too slow."

20. As a result of this bullying, Jackie Perry transferred to a position at the Boston Public Library.

21. Robyn Christian, also a Black woman and senior streetworker supervisor, was targeted by Peeples. He said Christian was too old and had been there too long. She is 53. She had been there since the program started.

22. In or about January 2020, Talia Wright-Rivera, made it mandatory for the Streetworkers to drive around the city in crowded vans of approximately 14 workers at a time. In the many years that the program existed, this has never been a requirement. Workers had always been allowed to take their own car and meet the team at a given location.

23. Streetworker, Jamaine Gaitor, also a Union Steward, objected to getting into the crowded van. Stephen "Donnie" Powell, also objected to getting on the crowded van, both citing their disabilities. Both Gaitor and Powell were told to get on anyway.

24. When Powell requested to meet Wright-Rivera and Wascar Castillo, Director of Human Resources, to discuss his need for an accommodation to his disability that would allow him to meet the group at outside locations without driving in the crowded van, Mr. Powell asked if Mr. Gaitor, as his union steward, to accompany him, fearing it would be a disciplinary procedure. Rivera and Castillo made Gaitor leave, asserting that if he stayed, it would then turn into a disciplinary meeting for Mr. Powell.

25. In approximately July of 2020, Plaintiff applied for and received a promotion to Resource Coordinator, along with Jamaine Gaitor ("Mr. Gaitor").

26. While he did eventually receive the promotion on a probationary basis, Plaintiff and Mr. Gaitor were initially told they were "not qualified" to be Resource Coordinators, even though the job description was very similar to that of Streetworkers, and that SOAR did not want to hire internally despite Plaintiff's experience.

27. It was clear to Plaintiff that he and Mr. Gaitor were being set up to fail in their new positions, so that SOAR's management would have an excuse to terminate their employment. Other employees warned him of this as well.

28. With that promotion also came a four-month probationary period.

29. Plaintiff reported to Davo Jefferson, a Black Streetworker Supervisor, who only gave him positive feedback and raised no performance issues with him during this time. In fact both he and Gaitor had some of the best performance statistics of all of the Resource Coordinators there at the time.

30. On or about October 8, 2020, in a regular daily roll call meeting of about 30 people, the group raised a complaint with Wright-Rivera for not following Covid-19 protocols, specifically that employees had no Personal Protective Equipment (PPE), no plastic shields for cubicles or desks, no one coming through every two hours to wipe down common areas, no hot water in the building, and no one screening individuals for Covid-19 symptoms when they came into the building.

31. In response, Wright-Rivera gave all employees five throw-away masks and told them to keep recycling them.

32. Wright-Rivera still required employees to get into a crowded van together. She told them that if they had a problem then they should use FMLA or to "do what they have to

do." This, despite disciplining workers for taking a personal days instead of getting on the van previously.

33. After this, many coworkers complained to Plaintiff as the Union Steward. A letter was written as well, which Plaintiff also signed on to, to the Boston Public Health Commission, Mayor Marty Walsh, Marty Martinez, the Chief of Human Services, a few Boston City Council members and others, complaining of the lack of Covid-19 protocols in place.

34. Plaintiff had seen and assisted with numerous grievances on behalf of coworkers as well as himself a result of Defendant's inaction relative to Covid-19 protocols, and for their treatment of older or disabled workers, and/or for retaliation against Union Stewards.

35. When employees would attempt to speak at the office, including just a few people in the kitchen, Defendants Peeples and Wright-Rivera would immediately break it up, fearing that they were discussing Union matters. This was especially true if they saw someone talking specifically to a Union steward, such as Plaintiff or Jamaine Gaitor. Defendants would say that the office doors needed to be kept open. Peeples once remarked walking away from an office in which several people were talking that he would like to "throw a bomb in there and blow [it] up."

36. On occasion when Wright-Rivera would come in and break up a discussion, she would tell them "the union can't help you now."

37. Plaintiff was told by another worker at SOAR who had been involved in discussions between Wright-Rivera and Labor Relations that Wright Rivera had asked how she could "get rid of" Plaintiff, Gaitor and other employees who spoke out about the

conditions and environment in SOAR. Wright-Rivera specifically said that she "did not want to move against" Plaintiff until the "nail was in the coffin."

38. Defendants suspended Plaintiff with pay for three weeks on or about November 2, 2020 when Gaitor was also fired. No reason was given except that it was due to Gaitor's "misconduct." Plaintiff was extremely anxious during this time, as he had kids in college and bills to pay and did not know where his job stood.

39. Defendant entered therapy through Employee Assistance Program, or EAP because of suspension and the anxiety it was causing him.

40. The reason finally given to Plaintiff was that his Efforts to Outcome were insufficient, and he talked too much to coworkers. Plaintiff believes the real reason was that Defendant's believed that he was behind the anonymous letter along with Gaitor.

41. On or about November 4, 2020 Plaintiff's probation period was set to end.

42. When he returned to work in late November early December, 2020, he was given bullet points regarding not speaking to other coworkers and improving his numbers. Plaintiff worked hard to keep his head down and do his work.

43. The second probationary period was set to ended around the first of April 2021. Just prior to his probationary period ending, Defendant told Plaintiff that he would be fired, because he was intimidating Donell Singleton and making it a hostile work environment for him. This was not true.

44. The next day, Labor Relations attorney, Kristofer Wilson informed Plaintiff that the firing had been put on hold, but that Plaintiff should "look at other opportunities."

45. When he returned from leave in April, Plaintiff's probation was reset for nine (9) months, notwithstanding that the Collective Bargaining Agreement (CBA) and City

policies did not allow for this. Thus his probationary period last for ¾ of 2021 and was now set to end or about April 4, 2021. He was forced to take 14 months of leave in total.

46. Plaintiff found a job at the Boston Public Health Commission starting on April 28, 2021.

47. Plaintiff was making approximately $52,000.00 annually as Resource Coordinator for the SOAR program.

48. Plaintiff obtained a position as Case Manager/Assistant Coordinator/Community Support Specialist, at the Boston Public Health Commission, making $39,000.00 per year.

49. Plaintiff and his Black coworkers were thus disciplined for infractions for which neither White employees nor Hispanic employees would have been disciplined, and they were exposed to a chronic hostile work environment.

50. Plaintiff has satisfied all necessary prerequisites to bringing this action.

## COUNT I
## Retaliation in Violation of the Massachusetts Whistleblower Act, M.G.L. c.149, sec. 185 (b)(1)
*As to Defendant City of Boston- SOAR*

51. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

52. Defendant's actions constitute retaliation for disclosing a violation of the Covid-19 mandate, which was a risk to public health and safety, in violation of M.G.L. c.149, sec. 185(b)(1).

53. As a result of Defendants' actions, Plaintiff has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

54. Defendants are liable for three times the amount of Plaintiff's lost wages, front and back pay, attorneys' fees and costs, compensatory damages and punitive damages so proven at trial.

## COUNT II
### Retaliation in Violation of the Massachusetts Whistleblower Act, M.G.L. c.149, sec. 185 (b) (3)
*As to Defendant City of Boston-SOAR*

55. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

56. Defendants' actions constitute retaliation for Plaintiff's refusal to participate in actions which violate the law or which put public health or safety at risk, in violation of M.G.L. c.149, sec. 185(b)(3).

57. As a result of Defendants' actions, Plaintiff has suffered lost wages, both front and back pay, compensatory damages and emotional distress.

58. Defendants are liable for three times the amount of Plaintiff's lost wages, front and back pay, attorneys' fees and costs, compensatory damages and punitive damages so proven at trial.

59. Defendants are liable for Plaintiff's lost wages, front and back pay, attorneys' fees and costs, compensatory damages and punitive damages so proven at trial.

## COUNT III
### Intentional Infliction of Emotional Distress
*As to All Defendants*

60. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

61. Defendants' actions constitute intentional infliction of emotional distress.

62. Defendants are liable for Plaintiff's lost wages, front and back pay, compensatory damages and punitive damages so proven at trial.

## COUNT IV
### Negligent Hiring and Promotion of Individual Defendants In Violation of the Massachusetts Tort Claims Act, M.G.L. c.258 section 10(j)
*As to City of Boston-SOAR*

63. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

64. Defendant City of Boston's actions in negligently hiring and promoting the individual defendants caused the tortious acts to be perpetrated upon Plaintiff by them.

65. Defendants are liable for Plaintiff's lost wages, front and back pay, compensatory damages, punitive damages or any other damages so proven at trial.

### COUNT V
### Violation of Procedural and Substantive Due Process, pursuant to M.G.L. c.12 section 11I
*As to City of Boston-SOAR*

66. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

67. Defendant's actions constitute both procedural and substantive due process violations of Plaintiff's civil rights, in violation of M.G.L. c.12 section 11I.

68. Defendants are liable for Plaintiff's lost wages, front and back pay, compensatory damages, punitive damages or any other damages so proven at trial.

69. Plaintiff suffered emotional distress, lost wages and other consequential damages, so proven at trial.

### COUNT VI
### Violation of Plaintiff's Civil Rights, Pursuant to 42 U.S.C. section 1983
*As to City of Boston-SOAR*

70. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

71. Defendant's actions constitute both procedural and substantive due process violations of Plaintiff's civil rights, in violation of 42 US.C. section 1983.

72. Defendants are liable for Plaintiff's lost wages, front and back pay, compensatory damages, punitive damages or any other damages so proven at trial.

73. Plaintiff suffered emotional distress, lost wages and other consequential damages, so proven at trial.

**COUNT VI**
**Violation of Plaintiff's Civil Rights,**
**Pursuant to 42 U.S.C. section 1981**
*As to City of Boston-SOAR*

74. The Plaintiff restates the foregoing paragraphs and incorporates them herein.

75. Defendant's actions constitute both procedural and substantive due process violations of Plaintiff's civil rights, in violation of 42 US.C. section 1981.

76. Defendants are liable for Plaintiff's lost wages, front and back pay, compensatory damages, punitive damages or any other damages so proven at trial.

77. Plaintiff suffered emotional distress, lost wages and other consequential damages, so proven at trial.

WHEREFORE, the Plaintiff requests that the Court:

a. Award the full amount of his damages incurred as a result of Defendants' discriminatory actions, including without limit lost back and front pay, punitive damages, reasonable attorneys' fees and costs incurred or any other damage the court deems fit; and

b. Award the Plaintiff such other and further relief as the Court deems appropriate.

**PLAINTIFF CLAIMS A JURY TRIAL AS TO ALL ISSUES SO TRIABLE.**

Respectfully submitted,

Tereck Jamison
By his attorney,

*/s/ Janet Ruggieri*

11

Janet Ruggieri, BBO#634431
Murphy & Rudolf, LLP
Worcester, MA 01608
Telephone: (508) 425-6330
Fax: (508) 536-0834
ruggieri@murphyrudolf.com

Dated:  6/30/22